Good morning, Your Honors. Richard Sagerboom here on behalf of Ms. Clifford. This is a pregnancy discrimination case. My client, Katie Clifford, was terminated at the time she was four months pregnant, just days after she learned and informed her company that her pregnancy had some issues. She was in and out of surgery and then was placed on restrictions by her doctor. We've argued that she was terminated because she informed her employer of the problems with her pregnancy. During the district court, the case was argued. The district court ruled that we had not proven a prima facie case of pregnancy discrimination and dismissed it on that basis. And the ruling from the district court was that the second element of the prima facie case, which is to show that your client or that the plaintiff is performing satisfactorily, had not been met because she had issues with cash procedures during the two-year course of her employment. What were the relevant remarks that were made that you regard as indicating an animus with respect to this lady's pregnancy? The remarks were by her immediate supervisor and dealt with her condition, making fun of her appearance. But the timing of the termination is really the basis for it. I understand, but what exactly was it? It seems to me the remarks were probably rude, but I'm not clear that a great deal could be derived from them that would indicate some sort of animus on account of her pregnancy. What did he say? He made fun of her. He would stick out his belly and compare himself to her. He wrote her up because he couldn't tuck her shirt in because of the size of her stomach. But they were not overtly, I hate you because you're pregnant. So I wouldn't characterize them as— So your main points, I gather, are A, the timing, and B, the conflicting reasons that the defendant gave for termination. Absolutely. And all that makes—put together, that's enough for a jury case. Absolutely. And particularly I would focus on the timing because the incident which they claimed was the basis for the termination occurred on September 17th. Nothing happened between September 17th and October 2nd, which is over two weeks. On October 2nd, she found out from her doctor that she had to have surgery on her because of her pregnancy. On October 3rd, she went in for the surgery. On October 5th, her doctor sent a letter requesting accommodations because of her problems with pregnancy. She couldn't lift anything. When she returned to work on the 8th, she was terminated. Nothing happened between the 17th, when the incident occurred, which they claimed was the basis for the termination, and the 8th, other than the issues with the problem of pregnancy. And they claimed that all during this time they were talking about why she should be fired, but they have no e-mails, letters, check requests, nothing, between that period, to show that they were contemplating her termination until she went to the doctor and the doctor said there's a problem with pregnancy. This is four months after they knew she was pregnant. So, I mean, timing alone is normally not enough, but in this case, there's no other basis. If you go out on a disability because of your pregnancy and you're terminated the next day. Does it matter that the same individual terminated her who made the remarks that you referenced? No. The immediate supervisor made the remarks and his boss was the one that claims he made the termination decision. Does that make a difference? The remarks would be less sufficient because of that connection, but the reality, again, is on the 2nd, when she learned that she had this, she went to the doctor, the doctor said you have to have surgery tomorrow, immediately. She called the guy who made the remarks and told him. But that's not the guy who terminated her. Well, that's who they say, but obviously at that point, that's the only person she talked to in the company before she was terminated by, you know, the following Monday. Well, how many different explanations did they give for the termination? The first, well, first off, when she, when she, the issue was she. Two or three, how many? There were at least three. Okay. All right. But were they all related to cash handling violations? Was there anything other than the cash handling? No. They all went back to the issue of there was a $100 overage in the account. But there are discrepancies as far as what happened. And the fact is that she didn't violate any procedures. It was a typical thing where you count out the bank, the bank was $100 over. The discrepancy was discovered immediately. It was reported immediately. All the procedures were followed just like they wanted. And, again, this happened on the 17th of September. Nothing happened. She continued to work, handle cash, do all her jobs until October 2nd when she goes to the doctor. The doctor says you have to have immediate surgery tomorrow, and then she's fired. And the only document that exists contemporaneously about the termination says she was fired on October the 3rd. Wasn't there a deposition testimony saying that the termination was in the works? Absolutely. So how can there be a material issue of fact if that deposition testimony is unconfirmed? Well, because the only document we have says she was terminated on the 3rd. That's an e-mail that was written at the time. Otherwise, you have somebody testifying two years later or three years later, oh, we made the decision two weeks earlier. But this is a big company. If they're going to terminate somebody, you would have an e-mail, you would have a letter. And what happened? What did she tell them between September 17th and October 2nd about her pregnancy? On October 2nd, she said, I just came from the doctor, and the doctor says I have to have surgery tomorrow. She had surgery on the 3rd, which was Wednesday. Thursday, she was out on leave. Friday, her doctor sent a letter to the employer saying this is a problem pregnancy, she had this surgery, and she has restrictions on what she can do as far as lifting. That was on Friday. She went back to work on Monday, and she walks in, and they say come meet the boss, and he says, oh, I understand you have major life issues. You're fired. That's October 8th, and the incident happened on September 17th. There is nothing in the record between those two dates. They never put in the road up why she was fired at the time. So two years later, we have a deposition testimony. Oh, yes, we did all these things, but nothing we have back in 2007 when this happened. But, I mean, you don't get discrimination due to sloppy business practices. So that's not necessarily very strong evidence, just the fact that the business practices were sloppy. Well, the strongest evidence, Your Honor, is the fact that something happens on the 17th, which supposedly is a big deal, how you handle cash, right? You don't do anything to her on the 18th, 19th, 20th, let her continue her job. Nothing happens. No one says boo. The doctor says you have to have surgery tomorrow, and all of a sudden they fire her two weeks later, three weeks later. Why would they have fired her because she was pregnant? Any explanation? Because of the problem of pregnancy. And why would that have been a problem? Just because she was going to have more absences? Right. She was going to have absences. She couldn't do some of the things. She had to wash cars and things. She couldn't do some of the work that she had been used to doing. You know, I mean, we don't know for sure, but obviously there could be insurance problems. You know, she was just not going to be 100 percent employee. The Nevada Employment EEOC, the equivalent of the EEOC, finds that there had been other employees there that had been pregnant and hadn't had any difficulties. I'm just wondering, you know, what evidence you have that among all of these pregnant people that she was the one who was singled out and discriminated against on the basis of a pregnancy. Well, first off, she was the one who had the problem of pregnancy. There was no problem until she had to have the surgery and then have the restrictions. But, you know, there's a saying about coincidence, and when something happens that remotely in time, there's probably more to it than a coincidence. And the fact is we don't have anything in writing from them saying at the time why she was fired, what happened during that time period. It's just blank. And then you have deposition testimony two or three years later saying, oh, this is what we did. The other thing is at one point they actually accused her of stealing $100, which was totally untrue. And the money was immediately discovered and deposited. It was not a big issue. Do you want to save any time for a follow-up? Yeah, I'm sorry. Your Honor, can I save my time? Thank you. Thank you. Good morning, Your Honors. May it please the Court. My name is Kim Boyle, and along with my co-counsel, Aaron Malone, we represent the appellee DDG Operations, Inc. This case addresses the issue of a plaintiff who has not put forth competent summary judgment evidence that she was discriminated against on the basis of her pregnancy by her employer such that the district court decision granting DTG's motion for summary judgment should be affirmed. I would like to address three main issues with the Court today. First, Clifford could not satisfy the threshold prima facie requirement under the second prong of McDonnell Douglas that she was satisfactorily performing her job as station manager. Alternatively, Clifford failed to prove the fourth prong of the prima facie requirement under McDonnell Douglas that she was treated differently from similarly situated individuals outside of the protected class. And third and probably most importantly, Clifford failed to prove by the requisite standard of preponderance of the evidence that DTG's proffered, non-discriminatory, legitimate business reason for her termination was somehow a pretext for pregnancy discrimination. Going back to the first issue, your honors, the district court opinion was clearly tailored to the precedent of this court. While there is a prima facie showing that the employee was satisfactorily performing their job, she must be able to show that she was doing the job well enough to rule out the possibility that she was fired for inadequate job performance. In this case, the record on summary judgment is clear and undisputed. She had an extensive disciplinary record in the two years of her employment from August 2005 through the date of termination of October 8. She had four cash handling violations. Those four had occurred prior to any announcement of her pregnancy. January of 06, January of 07, May of 07, and June of 07. The June of 07 disciplinary violation is consistent with the company's progressive discipline, wherein she was actually suspended as a managerial employee without pay for two days. So then you have the four cash violations, but she also had four non-cash violations. July of 06, two written warnings, November of 06, and December of 06. So all together, within a basically two-year period, she had eight written disciplinary violations showing that she was not properly doing her job. There were declining performance evaluations. Her last one, January of 07, and I'd like to point out to the court, that took place prior to the bulk of these cash handling violations, said that she was fair, made it clear that she had substantial improvement to be, and that she was really at the bottom end of being fair, rated at a 2.6. The company was consistent with this progressive discipline, wherein she was, the last step prior to a natural termination, was a suspension without pay for failing to properly deposit money as she was required to do, such that she could not even meet her prima facie showing that she was satisfactorily performing the job, Your Honors. However, in addition to the fact, in addition to the fact that the district court relied upon this on whether or not she was satisfactorily performing the job, this Court can also look at whether or not she met the fourth prong of the McDonnell-Douglas test, i.e., whether she was similarly situated. Under this Court's ruling, it is clear that she was not similarly situated to individuals outside of the protected class. Under the Ninth Circuit, first of all, supervisors are generally deemed not to be similarly situated to lower-level employees, such that Ms. Clifford attempts to compare herself somehow to the rental agent who miscounted the money in the first place. Moreover, this Court has said in Moran v. Selig that similarly situated means employees must be similarly situated in all material respects. It is clear that there is no comparison between Ms. Clifford, who was a two-year managerial employee, who had eight disciplinary violations whose evaluations were starting to decline, and, in fact, who admitted to having the four cash violations prior to any knowledge by her employer that she was pregnant. It was clear that not only was she not similarly situated in immaterial respects, she was not similarly situated in material respects, such that under this Court's ruling in Cigna, such that under this Court's ruling in Jackson, this Court can look at the entire record and still make the determination that she did not and could not satisfy her prima facie standard that, one, she was satisfactorily performing the job, but then the fourth prong of McDonnell-Douglas, that she was similarly situated, and can, and we request that the Court does affirm the ruling on the entire record. Counsel, may I ask you, what's your response to opposing counsel's emphasis on the timing of her informing the employer that she was going to have a problem pregnancy and the termination and the lack of action between those times? Well, first of all, Your Honor, my response is that that is completely a red herring and is of no legal or factual significance whatsoever. Opposing counsel and Ms. Clifford in her brief attempt to make a big deal out of the fact that there seemed to be some alleged large period of time between the violation, which took place late on the night of September 17, 2007, and her actual termination on October 8 of 2007. There was nothing inconsistent with how the company handled its investigation of this particular violation with her prior cash violation investigations. First of all, Your Honor, as stated, she had four prior cash violations. On the first one, there was an 11-day difference between the time of the violation and the time that she was presented with the write-up. On the third one, there was an 11-day gap in time. On the fourth one, there was an 11-day quote-unquote gap in time. On none of those prior cash violations, again, where there was no issue of her being pregnancy, was she sent home, was she asked to go home? There are no timing issues whatsoever. And going back to Your Honor's point during my opposing counsel's argument as it relates to what's actually in the record, those assertions in deposition and in declarations are undisputed as to the relevant timeline taken by DTG as it relates to what it actually did. The incident took place on September 17. Ms. Clifford came in on September 18 and went straight to her supervisor, or I should say the general manager, Mr. Hopkins, and told him about that problem. Then Mr. Hopkins made the recommendation to HR on September 21, and that's undisputed, that she should be terminated. Consistent with the policies of the company, in order to terminate a station manager such as Ms. Clifford, there had to be approval from the human resources department and or from the legal department. Now, what's the nature of your proof for all this? I'm sorry, Your Honor? What's the nature of your proof for all this? The nature of the proof on this, Your Honor, is a declaration that's undisputed by Betancourt, who is in the HR department. So it's just deposition testimony? There's deposition testimony of Mr. Hopkins, who is the ultimate decision-maker who made the recommendation. Okay, but I'm sorry to interrupt again. I'm sorry, Your Honor. Is it just deposition testimony from people in your company? It's deposition testimony and declaration testimony, Your Honor. So why would the jury have to believe that? Well, Your Honor, based on the fact that under Rule 56, under the Celotex standard by the Supreme Court, it is the burden of the plaintiff to come forth and contest whether or not that ---- It's uncontradicted, that's true. It is uncontradicted, Your Honor. But, I mean, why would it have to be believed? It could be disputed. I mean, it's your self-serving version of what happened. In this procedural posture, are we required to believe everything that you say, that your company says? What possible ---- I mean, it seems to me that this is the kind of thing that lies only in your knowledge. I'm not sure how a plaintiff in this lady's situation could ever come up with testimony that contradicted your testimony about what happened essentially in secret. Well, Your Honor, I don't think that there was anything that necessarily happened in secret, because if we jump to the third issue that I addressed with the Court, the pretext issue, as this Court is aware, the plaintiff actually has the substantial burden of proving the preponderance of the evidence. But that's true. But the whole ---- but the question of whether there's been sufficient evidence of pretext is to be judged with respect to the entire record, including those parts of the record that support the making of the primate patient case. Well, Your Honor ---- So here, I'm not sure why isn't the fact that this ---- the action seems to have taken very ---- been taken very close upon her letting the company know about her problem of pregnancy, coupled with the evidence of conflicting reasons for termination enough to make out a pretext case. Well, Your Honor, if I can respond briefly. First of all, under this Court's decisions in Schraight, Amos, and other cases, the temporal proximity is only used on very rare occasions for purposes of disproving the legitimate nondiscriminatory business reasons articulated. Second, as stated, Your Honor, it is clear that the burden, a substantial burden of proof is on the plaintiff to prove pretext. In these discrimination cases, if I may finish, these discrimination cases largely fall on information, some of which is within the unique possession of the employer, some of which may be within the unique possession of the employee. But here, the evidence is undisputed. She has not been able to dispute the evidence. And there's nothing that's inconsistent or contradictory with how this last violation was handled compared to the first four cash violations, which, if I may finish, Your Honors, those first four cash violations, that all took place prior to the time that the company was aware that she was pregnant. All right. Thank you, counsel. Thank you, Your Honor. Rebuttal. Thank you, Your Honor. I just wanted to correct one misstatement she made. She said that the previous write-ups had taken comparable amounts of time before they were actually written up between the incident and the write-up. The fourth incident, she said, was 11 days. It was only six days between. But it wasn't immediate. I think that was her point, is that none of these were immediate. Right. But again, we're talking about three weeks in this case, of which there is absolutely no record. There is one document written at the time. It's an e-mail dated October 10th, and that document says the termination was the 3rd of October. She went to the doctor on the 2nd, and that's when the doctor told her she had to have the surgery on the 3rd, and she informed her boss that she had to have surgery the next day on the 3rd. And the document they wrote, which is the only contemporaneous doc, says she was terminated on the 3rd, the same day as the surgery. Again, three weeks after this supposed cash thing. Another thing, just you asked me about why she would want to be ---- Who would have known at DTG that she had a high-risk pregnancy? She called Mark Pfeiffer, who is the gentleman who made the comments. Whether he talked to the supervisor or not, that's not clear. Do you have any evidence that Pfeiffer was involved in the decision to terminate? I don't, other than the fact she told him. And then his name is on the termination, the one document we have, the contemporaneous e-mail. But obviously he, well, anyway, I don't know. But as Your Honor said, we have, they talk about these great, what happened, but there's no record to substantiate what they're saying. And you don't have to believe, or the jury doesn't have to believe what they say. But you have, the problem is you have to raise a material issue of fact to even get to the jury. Right, but if you wait, I mean, how, what happens if this happened two months later? I mean, at some point, there's got to be an inference that it's not the incident they're claiming, and it's the fact that she tells them she's having surgery the next day on her pregnancy. I just want to address one other issue, which is you asked me about why they want to fire her. The actual letter that they got on the Friday, the 5th, said that she could only work six hours a day, that she had to be given rest when she wanted it, and that she could only carry 10 pounds. So, I mean, it wasn't just watch out for her. It was a fairly restrictive. In her deposition, she has asked whether she knows, whether she has any information that Pfeiffer shared the information with Hopkins. I gather Hopkins is the big boss who made the decision. Right. And she says she doesn't have any information. And she's asked directly whether she knew, whether Mr. Hopkins knew that she had a high-risk pregnancy, and she can only answer, he knew I was pregnant. Right. And she says, I don't know whether he knew it was high-risk. Again, there's an inference, somehow or other, in my opinion. But here's what he said. On Monday the 8th, she comes to work. He calls her into the office and says, I understand you have some life-changing things going on. You're fired. So, obviously, he was well aware of her pregnancy. And this is the Las Vegas office. This isn't the national office. Obviously, at least I think the inference is that they would talk. I mean, she's four months pregnant. You're going to put someone in a moment out on the street without a job and not bother with a high-risk pregnancy and not bother to talk about it? Realistically, I don't think that makes sense. All right. Thank you, Counselor. Thank you, Your Honor. Thank you to both Counselors. The case is argued and submitted for decision by the court.
judges: Arnold, Rawlinson, Bybee